Richard M. Pachulski (CA Bar No. 90073)
Jeffrey W. Dulberg (CA Bar No. 181200)
Steven J. Kahn (CA Bar No. 76933)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
Email: rpachulski@pszjlaw.com; jrichards@pszjlaw.com;
jdulberg@pszjlaw.com

Attorneys for David K. Gottlieb,
Chapter 7 Trustee for: KSL Media, Inc.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>KSL MEDIA, INC., *et al.*,<br><br>Debtors.<br><br>☒ Affects KSL Media, Inc.<br>☐ Affects T.V. 10's, LLC<br>☐ Affects Fulcrum 5, Inc.<br>☐ Affects All Debtors. | Case No.: 1:13-bk-15929-AA<br><br>[Jointly Administered with Case Nos.: 1:13-bk-15930-AA and 1:13-bk-15931-AA]<br><br>Chapter 7 |
| DAVID K. GOTTLIEB, as Chapter 7 Trustee for KSL Media, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>KALMAN S. LIEBOWITZ, HAROLD COHEN and RUSSELL MEISELS,<br><br>Defendants. | Adv. No. _____<br><br>**COMPLAINT FOR BREACH OF FIDUCIARY DUTY** |

Plaintiff, David K. Gottlieb, as Chapter 7 Trustee for KSL Media, Inc. (the "<u>Trustee</u>" or "<u>Plaintiff</u>"), alleges as follows:

DOCS_LA:279975.2 47516/003

1

# I.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is not a core proceeding under 28 U.S.C. § 157(b). Venue herein is proper pursuant to 28 U.S.C. §§ 1409(a) and 1409(c).

# II.

## THE PARTIES

2. On September 11, 2013, KSL Media, Inc. ("KSL"), T.V. 10's, LLC (TV 10's) and Fulcrum 5, Inc. ("Fulcrum 5", and together with KSL and TV 10's individually a "Debtor" and collectively, the "Debtors") filed their Chapter 11 petitions (the "Petitions") with the Bankruptcy Court on September 11, 2013 (the "Petition Date") and their cases were converted to Chapter 7 proceedings by order entered on December 30, 2013. On the same date, the Trustee was appointed by the Bankruptcy Court as Chapter 7 trustee for the bankruptcy estate (the "KSL Estate") of KSL; the Chapter 7 trustee of the bankruptcy estate (the "TV 10 Estate") of TV 10's; and the Chapter 7 trustee for the bankruptcy estate (the "Fulcrum 5 Estate") of Fulcrum 5, Inc.

3. Plaintiff is informed and believes and thereon alleges that Defendant Kalman S. Liebowitz ("Liebowitz") is an individual residing within this judicial district, and was at all times mentioned herein the Chairman of the Board of Directors of KSL, and was, at various times stated herein, the Chief Executive Officer, Chief Financial Officer, Secretary and effective co-Chief Executive Officer of KSL, and was an active participant in the management of KSL through the Petition Date. Liebowitz filed for bankruptcy on or about October 21, 2014. With respect to Liebowitz, as to the matters set forth in this Complaint, Plaintiff seeks to recover only insurance proceeds available under any insurance policies issued for the benefit of Liebowitz, and not any other assets of Liebowitz. Thus, the automatic stay in effect in his bankruptcy case does not apply.

4. Plaintiff is informed and believes and thereon alleges that Defendant Harold Cohen ("Cohen") is an individual residing within this judicial district, and was at all times pertinent herein the President and later the Chief Executive Officer of KSL and was an active participant in the management of KSL through his resignation on August 21, 2013.

DOCS_LA:279975.2 47516/003

2

5. Plaintiff is informed and believes and thereon alleges that Defendant Russell Meisels ("Meisels") is an individual residing within this judicial district, and was from approximately December 2011 through the Petition Date, the Chief Financial Officer of KSL, and as such, an active participant in the financial management of KSL.

## III.

## FACTUAL OVERVIEW

6. KSL was formed in 1981 by Liebowitz to offer stand-alone media planning and purchasing services to clients. Following a short period of time between 1999 and approximately October 2001, during which time KSL was an operating unit of True North Communications, Inc. (and its successors in interest) ("True North"), KSL was and remained a private corporation through the Petition Date.

7. In general, KSL's business was to work with each client (or that client's advertising agency) to develop media buying plans designed to maximize desired exposure to consumers of each client's products or services, including placement on a variety of media platforms, including television, radio, print, digital, billboards or event sponsorships.

8. In general, following reaching the terms of a media buying plan, KSL would prepare an estimate of the cost of media purchases (including, if applicable, KSL's retainer fee or commission based on media cost), order future media placement from media vendors, and issue an invoice to its clients based thereon. Clients were required to pre-pay to KSL the amount of the estimated invoice for media purchases, prior to or at the time of KSL's order for same, and prior to subsequent issuance of invoices by media vendors to KSL, which invoices were sometimes not issued by media for months after KSL orders for media placement and client pre-payments were made.

9. Thereafter, upon receipt of billings from media vendors, which would include detailed accounting for the actual times and locations of advertising, KSL would reconcile the media providers' purported performance against that which was ordered to determine the precise amount owed to the media provider, which might be nominally more or less than that ordered by KSL. After final reconciliation, KSL would then pay the media provider the actual amount due, and any under

DOCS_LA:279975.2 47516/003                                3

performance by a media provider would be carried as a "credit" for the benefit of the KSL client against a future advertising cycle.

10. Over the course of years, KSL was "successful" in the sense that it grew over the years to the point that it placed between $250 million and $350 million per year of media advertising on behalf of its clients, which clients included City National Bank, Guitar Center, Inc., PetSmart, Toshiba America Information Systems, Inc., Frontier Communications, Sapporo USA and Bacardi, among others. However, despite its client roster and volume of advertising placed on their clients' behalf, Plaintiff is informed and believes and thereon asserts that KSL was continually insolvent for at least six (6) years prior to the Petition Date in that its liabilities continually exceeded its assets at fair valuation, its expenses continually exceeded its revenues, and it was engaged in a business for which its property was an unreasonably small capital.

11. Plaintiff is informed and believes and thereon asserts that as of the Petition Date, the Debtor's assets totaled approximately $34 million in cash plus approximately $20 million in net accounts receivable, while its liabilities totaled approximately $85 million.

## IV.

### FIRST CLAIM FOR RELIEF

### (BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS)

12. Plaintiff refers to and incorporates herein by reference each and every allegation contained in Paragraphs 1-11, above, as though fully set forth herein.

13. At all times pertinent hereto, Defendants Liebowitz and Cohen were the senior officers of KSL and were actively involved in the management of KSL, and in December 2011, Meisels was hired as KSL's Chief Financial Officer and became actively involved in the financial management of KSL.

14. Although in approximately 2006, Cohen attained the title of Chief Executive Officer previously held by Liebowitz, Liebowitz did not relinquish all of his duties and responsibilities as Chief Executive Officer, and kept for himself the power to terminate employees and control access to financial information, and remained active in the management of KSL's business, including marketing KSL's services, negotiating client contracts and managing client accounts.

DOCS_LA:279975.2 47516/003                    4

15. As employees and the senior officers of KSL, Liebowitz, Cohen and Meisels owed fiduciary duties to protect KSL, its stakeholders, and by reason of its insolvency, its creditors, to act in the best interests of KSL, its stakeholders, and its creditors, and to utilize such care, including reasonable inquiry and oversight, as an ordinary prudent person in a like corporation would act under similar circumstances, including adequate financial and operational oversight and prevention of mismanagement.

16. Liebowitz, Cohen and Meisels breached these fiduciary duties by acting in a grossly negligent manner, causing harm to KSL and its creditors, in at least the particulars set forth below.

17. Cohen understood that he was responsible for the setting up of accounting processes at KSL after its divestiture from True North.

18. As to compensation for its provision of media buying services as set forth above, by reason of the decline of older style commission based compensation protocols for media buying from which KSL would earn its income, and the squeezing of commissions in the marketplace, Cohen undertook to change KSL's overall compensation structure to retainer billing by estimating the monthly number of hours required to service any particular client's account at a set hourly rate, which would include a profit number to be made built into such hourly rate, or a "cost-plus basis," which would be theoretically reviewed on a quarterly basis.

19. However, as acknowledged by Cohen under oath, KSL had "poor accounting" and he did not develop and implement the processes, procure the technology, or ensure the personnel training with the technology in use that would operate "correctly to track the hours the way it should have been tracked." As a result, and by reason a lack of any measure of reasonable oversight which continued through the Petition Date, the amount of employee hours dedicated to any specific client would often far exceed that amount estimated, which overages were not timely ascertained so that retainers could be adequately adjusted, thereby creating uncorrected operational losses.

20. Plaintiff is informed and believes, and thereon asserts, that Cohen and Liebowitz' "visibility" into company expenses were further exacerbated by their failure to procure and maintain other readily available and superior accounting software systems, and insist on the provision of

DOCS_LA:279975.2 47516/003                             5

adequate employee training to utilize the capabilities of the systems made available to the employees.

21. Although both Liebowitz and Cohen, as the senior officers of KSL bore the responsibility of exercising reasonable corporate and financial direction and oversight, they utterly failed to exercise any supervisorial oversight as to KSL's Controller, Geoffrey Charness ("Charness"), hired prior to Meisels, such that Charness was given check writing and wire transfer authority of up to $500,000 per transaction, and neither Liebowitz nor Cohen reviewed any banking statements or otherwise monitored disbursements of KSL funds by Charness, only to discover in early July 2010 that Charness utilized both KSL and personal credit cards for the payment of no less than $60 million per year of media purchase expenses, utilized KSL funds for personal purposes in a full amount yet to be determined, and apparently manipulated KSL's financial records to conceal various of his activities. Additionally, through grossly negligent lack of attention, Liebowitz authorized issuance of an American Express card to Charness affording Charness, but not KSL, access to membership "points" which, Plaintiff is informed and believes, given the volume of credit card charges made by Charness, resulted in the issuance of no less than 180 million points to Charness, reasonably valued at $900,000.

22. Despite revelation of Charness' apparent defalcations, following Charness' termination as Controller in 2010, and in gross dereliction of their duty of care, neither Liebowitz nor Cohen instituted substantive controls over its accounting personnel or systems, undertook to reconstruct an accurate financial record of KSL to determine whether KSL's business was operating, or could operate, profitably, nor implemented internal accounting systems that would accurately and timely reflect financial performance on a client-by-client basis, or compel timely review of same.

23. In a candid written self-evaluation in November 2011, Cohen acknowledged his failure in achieving profitability in that "expenses were greater than revenues," caused in part by high employee expenses, the continued insufficiency of the new CFO brought in on Charness' departure who, "hasn't provided monthly reports detailing overages and expenses with recommendations on how to make corrections," and Cohen's having "not acted on results of learning profitability of each account." Cohen further acknowledged his "inability to receive accurate and

timely financial reports," and the absence of, "a leader who made sure all employees and Finance who operate in the Advantage Systems know it cold," and that even though Cohen and Liebowitz, "found out over a year ago that Geoff Charness may have misappropriated KSL funds, . . . there is still no action plan in place between Kal, David [Sklaver] and me to make sure that it doesn't happen again," noting, finally, "Shame on us and our head of Finance for not insisting on a policy to protect the owners!" Plaintiff is informed and believes and thereon asserts that Cohen's performance as Chief Executive Officer thereafter through the Petition Date evidenced no demonstrable improvement.

24. Defendant Meisels was hired as CFO shortly thereafter in or about December 2011, and although, for the first time, a modicum of profitability reports were generated, Cohen and Liebowitz continued to fail to exercise any reasonable amount of corporate or financial oversight and controls, and Meisels failed to exercise any reasonable amount of corporate financial oversight and controls, and there were no substantive changes in operations caused to be put into place.

25. From the time Cohen became Chief Executive Officer of KSL through the time he resigned on August 21, 2013, three weeks before the Petition Date, he generally reviewed mostly projections of revenues as opposed to profitability reports, and his focus was on maintaining client relationships and acquiring new business in an effort to grow revenues. According to Cohen, by reason thereof he delegated financial oversight to Liebowitz, as to which, according to Cohen, Liebowitz would opine, "Well, you and I aren't really good at this."

26. Despite this delegation of authority over financial matters by Cohen to Liebowitz, Cohen states that there remained no internal controls over disbursements from the company, and although he was receiving financial information on the revenue side, consisting of account managers providing revenue <u>projections</u>, there remained no checks and balances on the expense side.

27. For his part, Liebowitz avers that he was never provided profitability statements on any account during the time of Charness' tenure at KSL and that he believed KSL was profitable because it was picking up accounts and growing at a rapid rate. Thereafter, Liebowitz avers, he did not have time to review any detailed financial information regarding KSL as his focus was directed to the business activities of Debtors Fulcrum 5 and T.V. 10's, as well as bringing in new business to

KSL. From the date of Charness' departure in July, 2010 to the Petition Date, Liebowitz asserts that he received revenue <u>projections</u> from account executives, but no other financial reportings, and continued to believe that KSL was profitable. According to Liebowitz, he never looked at any reports as to what accounts actually did generate, as opposed to projections, because he was too busy. Although Liebowitz signed all tax returns relating to KSL, he stated under oath that he never read them before he signed them, nor thereafter.

28. Plaintiff is informed and believes, and thereon asserts, by reason of the gross negligent dereliction of the duty of care of Liebowitz and Cohen, and later that of Meisels as well, that at least from 2006 through the Petition Date, KSL's revenues were consistently exceeded by its operational expenses and that its continued survival was dependent upon its funding of operational losses through use of advertising clients' deposits of funds to be utilized for the purchase of media, which monies were available to fund such expenses and operating losses by reason of the sometime multiple month delay between the time such customer deposits were made and the dates payments became due to media vendors.

29. With the blind optimism blessing only the most foolish or uncomprehending, although aware of KSL's insolvency and negative cash flow operations from at least 2006, Cohen believed that the generation of increased revenues would rectify KSL's financial condition. Plaintiff is informed and believes, and thereon asserts, that Liebowitz wholly abdicated his duty of care over financial oversight and supervision, and failed to adequately apprehend KSL's desperate financial condition.

30. For his part, to the extent he was not aware previously, on or about April 30, 2012, Meisels received an email report from Donald Crandall, a forensic accountant who had been retained by KSL to ascertain potential adjustments to KSL's general ledger for the filing of KSL's 2010 tax return, in which Crandall advised Meisels that KSL is "deeply in debt and technically insolvent," that, "it appears that KSL Media has used cash flow from client prepayments to fund operations and operating losses," and that "its management should seek professional legal advice in connection with this breach."

DOCS_LA:279975.2 47516/003                                    8

31. Plaintiff is informed and believes, and thereon asserts that other than forwarding the aforesaid email to Liebowitz and Cohen, Meisels, in gross breach of his duty of care, Meisels did not insist upon or undertake a reconstruction of KSL's financial history to determine its viability as a business enterprise, nor undertake reasonably adequate measures to control costs, create a viable budget, or undertake other corrective actions to decrease losses to KSL and its creditors. As to Liebowitz and Cohen, the email was unheeded.

32. Ultimately KSL's ability to continue to operate came to an abrupt end when one of its largest clients, Bacardi, terminated its relationship with KSL in early 2013, depriving KSL of a major source of cash to continue to fund operations. KSL ceased business operations on the Petition Date.

33. By reason of the ongoing gross negligence of Liebowitz, Cohen and Meisels, through their respective dates of resignation, KSL, and its creditors, were damaged in a sum equal to the increasing losses incurred over the course of its continued operation and the costs and expenses incurred by reason of same, including those costs and attorneys' fee' incurred in relation to its bankruptcy proceeding, in an amount according to proof, but not less than $6 million.

**WHEREFORE**, Plaintiff prays for entry of judgment in his favor and against Defendants and each of them for:

1. Damages in a sum according to proof, but not less than $6 million;
2. For interest thereon at the legal rate;
3. For costs of suit incurred herein; and
4. For such other relief the Court deems just and proper.

1 | Dated: December 22, 2014

PACHULSKI STANG ZIEHL & JONES LLP

By /s/ Richard M. Pachulski
Richard M. Pachulski
Jeffrey W. Dulberg
Steven J. Kahn

Attorneys for
Plaintiff David K. Gottlieb,
Chapter 7 Trustee for KSL Media, Inc.

DOCS_LA:279975.2 47516/003

10